# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00531-CV

---

### A. S., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
### NO. 23-0099-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant A.S. (Mother) appeals from the trial court's order, following a jury trial, terminating her parental rights to her son D.S. ("Dylan"), who was approximately eleven years old at the time of trial.[1]  In two issues on appeal, Mother asserts that the evidence is legally and factually insufficient to prove by clear and convincing evidence that termination of her parental rights was in Dylan's best interest and that she endangered Dylan.  We will affirm the termination order.

### BACKGROUND

In July 2023, Mother arrived at Seton Williamson Hospital with one of her other children, fourteen-year-old daughter L.A. ("Lacy"), who had attempted suicide.  Mother then left

---

[1]  For the child's privacy, we refer to him using a pseudonym and to his parents and other relatives by their familial relationships to each other.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

the hospital and returned several hours later with another one of her children, four-year-old daughter D.E.S. (Dakota). Dylan was in the care of his maternal grandmother (Grandmother) at the time.

Austin Police Department Officer Enrique Alaniz III testified that he was dispatched to the hospital in response to a call that Mother "had arrived at the hospital, admitted to hospital staff she took some kind of narcotic or medication," specifically clonazepam, and "passed out." When Officer Alaniz arrived at the hospital, Mother "was talking to another officer and her demeanor was slightly altered, speech pattern slightly slurred, that sort of thing." A social worker advised Alaniz "that this is not the first time they had interaction with the mother and some of the children." Mother's other children "were not currently on scene," and Alaniz's "job for this call was to try to determine where those children were at due to the fact that hospital staff were concerned there was a possibility of possible human trafficking or abuse." Law enforcement eventually ascertained the whereabouts of the other children, who were with relatives.[2]

During their investigation, officers learned that Mother had an outstanding arrest warrant for driving while intoxicated, and they arrested her at the hospital for that offense. Upon her arrest, Mother "began to hyperventilate," suffered a panic attack, and was taken to the emergency room. Incident to Mother's arrest, officers discovered methamphetamine inside a wallet in her purse. After her release from the hospital, officers transported Mother to jail for the outstanding warrant and possession of methamphetamine.

---

[2] The concern regarding trafficking arose when Mother made a statement to social workers at the hospital "that a man had taken at least two of the children to Mexico, but she could not provide other information" to the social workers. However, law enforcement ruled out that concern after determining that the children were "accounted for and safe."

2

After the events at the hospital, the Texas Department of Family and Protective Services received a referral alleging the neglectful supervision of Lacy and Dakota by Mother, "as well as emotional abuse of [Lacy]." According to the Department's removal affidavit, a copy of which was admitted into evidence at trial, the referral stated that Lacy "was taken to the hospital after an ingestion of 20 or 28 Abilify and possibly other medications," "[t]here was a significant level of Tegretol found in [Lacy's] system," and Lacy "was at home at the time of the overdose." Although "[t]he full story is not known, as [Lacy] has been altered and unresponsive," when she initially arrived at the hospital, "she told staff that her mother told her to kill herself." "The referral went on to state that [Lacy] has an extensive history of suicide attempts going back to January 2023," having "attempted suicide once in January, three times in March, April and two times in May."

Lacy was transported from Seton to Dell's Children Hospital for further treatment. The doctor who was treating Lacy told the Department "that it would likely take several days for [Lacy] to become coherent and that she may experience hallucinations and aggression when doing so." The doctor further stated that "there was no quick way to help [Lacy's] body to clear the medication, therefore, it would have to wear off." Department investigator Julie Burks, who had prepared the removal affidavit, averred that "it was determined that the Department would take custody of [Lacy] as she was currently hospitalized, with no one to make medical decisions for her."

Burks "went to the Travis County Detention Center to provide [Mother] with a copy of the emergency removal notice" and talk to her about Lacy. Mother told Burks that she did not understand why she was in jail. When Burks informed her about the outstanding warrant

and the discovery of methamphetamine in her purse, Mother denied knowing about the warrant and denied that the methamphetamine belonged to her. Burks further averred:

> I asked [Mother] where she kept [Lacy's] medications and she informed me that she kept them in a lock box. I asked [Mother], if the medications were in a lock box, how did [Lacy] have access to her medications to overdose on them. [Mother] stated [Lacy] had been doing well for the past two weeks, so she got the medications out of the lock box and handed them to [Lacy] to take from the bottle.

> [Mother] stated that there were only approximately six or eight tablets in the bottle. She did not know where [Lacy] had gotten the other medication from that she took. I then asked [Mother] if she told her daughter to kill herself and she stated that she never said that.

Mother also denied to Burks that she had taken clonazepam or any drugs prior to her arrival at the hospital.

Burks interviewed Grandmother, who confirmed that Dylan had been living with her for the past month, "as things had been difficult for [Mother] and the children due to not having stable housing." Grandmother "indicated she had no concerns regarding her daughter's mental health and reported that she did not know her daughter to ever use any type of drug." Grandmother also "stated she had no problem with [Dylan] remaining with her for as long as he needed to be" but would not be able to provide for Lacy's care.

The removal affidavit went on to document Mother's previous history with the Department. In 2017, the Department received a referral alleging the sexual abuse of Lacy by Mother's boyfriend, as well as the neglectful supervision of Lacy by Mother. Lacy "was forensically interviewed during this case and made an outcry that [Mother's boyfriend] made her

4

suck his penis" and that Lacy's "younger sister was also present in the room when this occurred." Mother denied knowing of this incident until two to three weeks after it occurred and stated that she reported it to law enforcement on the day that she learned about it. The allegations of sexual abuse by the boyfriend were ruled as "reason to believe" but the allegations of neglectful supervision by Mother were "ruled out."

In 2018, the Department received a referral alleging the medical neglect of Lacy by Mother. "The referral indicated that [Lacy] had been actively suicidal for the last two weeks and that [Mother] had failed to provide adequate medical attention." However, during the investigation, it was learned that Lacy was not "actively suicidal" and that Mother had sought medical care for Lacy. Therefore, the allegations were ruled out.

In 2020 and 2021, the Department received referrals alleging the neglectful supervision of Dakota by Mother. The 2020 referral involved an allegation of domestic violence between Mother and Dakota's father while Mother was holding Dakota. This allegation was "ruled out" after investigators determined that during the incident Dakota's father had not pushed Mother across her chest as had been reported. The 2021 referral involved an allegation that Mother had left the children in the care of her oldest son, R.E. (Richard), who had thrown Dakota onto a bed, "which caused her to hit her head, causing a bruise." "Multiple referrals were received during the investigation, concerning [Mother] not following through with the proper care for [Richard's] mental health" and failing to ensure "that he was making his appointments and filling his medications." These allegations were ruled as "reason to believe."

In 2022, the Department received seven referrals alleging neglectful supervision by Mother, six involving Lacy and one involving Dylan. The referral involving Dylan indicated that Mother was "consistently late" in picking up Dylan from school and that Mother was

5

"neglectful in arranging for dependable transportation." The six referrals involving Lacy included allegations that Lacy "was self-harming and suicidal," that Mother "was suffering with schizophrenia" and "believes [Lacy] is trying to harm her"; that Mother's boyfriend "pinned [Lacy] down and raped her" and that when Lacy reported this to Mother, Mother "threatened her that if she told anyone about the abuse she would 'beat the shit out of her'"; that Lacy "contacted a crisis line as she was feeling suicidal and she either wanted to overdose on pills, slit her wrist, or jump out of a car," and that, when Lacy was transported to Dell Children's Hospital for treatment, Mother could not be contacted and it was unclear if Mother was aware that Lacy had been transported to the hospital; that "while the family was staying overnight in a hotel, [Mother] brought a man into the hotel and started having sex with him while [Lacy] and her siblings were in the room," that Lacy "tried to leave the room, but [Mother] made her come back and would not allow her to leave the room," and that "a friend of [Lacy's] mother told [Lacy] that her mother was using methamphetamine"; and "that [Lacy] was slapped approximately one-year prior by her mother's friend, possibly a boyfriend." These allegations were ultimately "ruled out and closed as factors controlled as it appeared that [Mother] was meeting the mental health needs of herself and her children to the best of her ability." At the close of the case in June 2023, Lacy was receiving inpatient treatment at Dell Children's Hospital. In July 2023, Lacy was released from Dell. Mother took Lacy home, where Lacy attempted suicide.

Burks concluded in the removal affidavit that "the Department is concerned with [Mother's] ability to appropriately supervise her children." These concerns included that Mother "recently provided her daughter with her mental health medications, which in turn, allowed the child," who had a history of self-harm and multiple suicide attempts, "to overdose on the medication"; that Mother "admitted to hospital staff that she took three clonazepam, which

6

caused her to be agitated and altered while at the hospital and led her to collapse at the same hospital while she was providing care for her four year old child"; that Mother "was driving in a vehicle under the influence of mind-altering medications with her child in the car"; and that Mother was using drugs because of the methamphetamine that was found in her purse at the time of her arrest for an outstanding warrant.

Based on the allegations in the removal affidavit, the Department filed its original petition seeking termination of Mother's parental rights to Lacy and Dylan.[3]  The Department also sought termination of the parental rights of Dylan's father J.G.S. (Father).  In an Interlocutory Agreed Final Order in Suit Affecting the Parent-Child Relationship, the Department was named Lacy's sole managing conservator and Mother was named Lacy's possessory conservator with limited rights and duties.[4]

The case proceeded to a three-day jury trial in late July 2024 concerning Mother's and Father's parental rights to Dylan.  In addition to Officer Alaniz, whose testimony is summarized above, the jury also heard from Department program director Nekilah Paylor, Court Appointed Special Advocate (CASA) volunteer Ismari Guerra, and Mother.  Father was not present at trial but was represented by counsel.

Paylor, who took over the case in July 2024, after the previous caseworker left the Department, testified that she had reviewed the case file, including the case notes made by previous caseworkers and the orders made by the trial court.  She was aware of the services that

---

[3]  Mother's other children were not subjects of this suit.  Dakota, the child who was with Mother at the hospital, was released at the hospital into her father's care, where she remained at the time of trial.

[4]  The record reflects that this order was made pursuant to a Rule 11 Agreement between the parties.  By the terms of the agreement, Mother's visitation of Lacy was "to continue to be monitored by a Therapist, at agreed upon times."

Mother was required to complete. A copy of Mother's service plan was admitted into evidence. Among other things, the plan required Mother to complete protective-parenting classes, submit to random drug screening within 24 hours of the Department's request, participate in a substance abuse assessment with the office of Outreach, Screening, Assessment and Referral (OSAR) and follow all recommendations made, complete a psychological evaluation and follow all recommendations, and complete individual therapy.

Paylor testified that in August 2023, Mother tested positive for methamphetamine, amphetamines, and cocaine. The Department's policy was to require drug testing at least once a month and do a hair-follicle test every three months. Mother tested negative for drugs in September 2023 but did not show up to drug test in October 2023, which the Department presumed to be a positive test. Mother tested negative on a urinalysis in November 2023 but refused to take a hair-follicle test at that time. Mother did not show up to her drug test in January 2024. In February 2024, her urinalysis was negative, but her hair strand was positive for methamphetamine and amphetamines. Mother did not test after that, although the Department had requested that she do so on multiple occasions.

Paylor recounted that Mother entered inpatient drug rehabilitation on April 9, 2024 and left on April 24, 2024, before completing the program. Paylor testified that Mother indicated to the Department that she left early because "she wasn't getting anything from the program." The discharge summary from the facility, a copy of which was admitted into evidence, indicated that Mother entered the facility with initial diagnoses of "amphetamine-type substance use disorder, Severe" and "cannabis use disorder, Severe." The "overall assessment indicates that [Mother] has made no progress towards achieving treatment goals" and that she left the facility "against professional advice" and with a "poor" prognosis. The discharge stated

8

that Mother "would be ill prepared to help her daughter through her trauma if she did not deal with her own trauma," "is often in denial or legitimately unaware that her behavior is problematic," "is inwardly focused and predominantly thinks about how changing her behavior will negatively affect her life," and "puts no consideration into the idea that change might bring about positive effects." Following Mother's discharge from the facility, the Department requested that Mother take a drug test on April 25. Mother did not do so.

Mother entered a second drug-rehabilitation facility on May 1 and was removed from the facility on May 8. Mother testified that the facility staff "kicked [her] out of rehab" because "[t]hey got mad that [Mother] switched rooms at night." Mother denied that they removed her because of "inappropriate sexual activity." Mother testified that she entered a third rehabilitation facility in Houston in July 2024, although the Department was unable to confirm her attendance there. Mother testified that at the time of trial, she was "trying to find a different rehab center."

Paylor testified that Mother's visits with Lacy and Dylan "were going well" early in the case until the Department received reports that during the visits, Mother was talking and "whispering" to the children about the case, which was not allowed. Paylor testified that both children reported that Mother was "blaming" Lacy "for the whole incident" at the hospital that started the case, which caused the children emotional distress and to experience "suicidal ideations." This prompted the Department to suspend Mother's visits.

Paylor acknowledged that Dylan did not want Mother's parental rights terminated. Nevertheless, she believed termination was in Dylan's best interest. The Department wanted Dylan "to be able to grow up and be happy and healthy and have the best things in life that he can," and Paylor did not believe that Mother was capable of providing

9

permanency to Dylan at this time. She explained, "[Mother] has not completed her service plan, she is not drug testing, we're not sure if she is actually clean, she has not shown that she is able to take care of Dylan."

Regarding Mother's court-ordered services, Paylor testified that Mother had completed a psychological evaluation but had not completed its recommendations, including protective-parenting classes, a domestic-violence course, and a psychiatric evaluation, which Paylor believed was important to complete because of Mother's mental-health issues. Mother also failed to provide the Department with any proof of housing or income.

CASA volunteer Guerra testified that she has known Dylan since the case began and has seen his improvement over time. When she first met him, Dylan "was very quiet, very reserved, did not really want to speak to me." One year later, "he was telling me about his away camp that he was at just last week, all the different activities that they were able to do. He's been telling me how much fun he's been having this summer." When the case began, Dylan was placed with Grandmother. He was removed from her care in late November or early December 2023, after Grandmother allowed Mother to have unsupervised access to Dylan and failed to report the unsupervised access to the Department. After that, Dylan was placed in a foster home, where he remained at the time of trial.

The foster placement was composed of a mother, father, two sons, and a younger daughter. Guerra recounted that Dylan was "very protective of his younger foster sister." Guerra testified that Dylan "has been doing really well" in this placement and was "talkative and excited" about it. He was seeing an individual therapist and had regular doctor and dental visits. Guerra opined that the foster parents gave Dylan a lot of their energy, time, and attention, and they supervised and disciplined him appropriately. Dylan was doing well in school; he had been

10

given the option to skip a grade ahead but chose to remain with his class. Since being placed with his foster family, Dylan has remained in communication with Lacy and his other siblings, and the foster family "has been very open and adamant about [Dylan] continuing those phone calls and that communication with his siblings." Guerra testified that the foster placement was a long-term, stable placement that was "open to adoption" if Mother's and Father's parental rights were terminated. Guerra believed the placement was able to provide for Dylan's emotional and physical needs. Guerra did not believe Mother could do so. Guerra added that the foster parents seem to have the energy and ability to monitor Dylan and their three other children, that they like Dylan in their home and want to keep him there, and that they have given her no indication that they would stop caring for Dylan. She believed that the placement would adopt Dylan if given the chance to do so. Paylor provided similar testimony regarding the placement and agreed that it was a "good fit" for Dylan and a home where he is "growing and prospering."

Regarding the services that Mother had been ordered to complete to obtain Dylan's return, Guerra testified that Mother completed a psychological evaluation in November 2023 but did not complete its recommendations, including a psychiatric evaluation, nurturing-parent classes, and domestic-violence classes. Guerra testified that there were also concerns regarding Mother's visits with Lacy and Dylan. She recounted one visit between Mother and Dylan that "resulted in [Dylan] having suicidal thoughts." According to Guerra, this was because Mother told Dylan that the case was Lacy's "fault" and that Lacy "was being brainwashed against them." Guerra testified that Mother told Lacy the same thing, that the case was her fault, and that this caused Lacy to blame herself for the situation. Additionally, Mother would sometimes "whisper" to the children about the case, and the Department had to admonish her not to do so.

11

Guerra also testified that she was concerned that Mother "has not provided a clean drug test in a while and that at this time she cannot provide a safe environment for [Dylan]." In June 2024, Mother told a Department caseworker that she "was willing to do everything in her power to get her kids back." The caseworker "asked her if she was willing to do a drug test that same day," and Mother "told us she would." The caseworker "made a referral to a drug testing center of [Mother's] choice so she could go that day," but Mother never went, despite having 24 hours to do so. Guerra explained that Mother's last drug test, in February 2024, was positive for methamphetamine and amphetamines. Mother had also tested positive for those substances in August 2023. Mother tested negative for drugs in September 2023 but did not appear for scheduled drug tests in October 2023. Guerra was concerned that Mother continued to use drugs after the case began because it demonstrated to her that Mother was not putting her children's needs first and that she might not be able to protect Dylan and make the right choices for him in the future. Further, Guerra disbelieved Mother's claim that she did not start using drugs until after the case began because of "[h]ow easily [Mother] was able to find those drugs after not previously doing them."

Guerra acknowledged that Dylan did not want to be adopted and did not want Mother's parental rights terminated. Nevertheless, Guerra believed that it was in Dylan's best interest for Mother's parental rights to be terminated and for him to be adopted because Dylan "deserves a stable home," and "[i]t is not fair for [Dylan] to be given false hope that [Mother] will remain clean."

Mother testified that she and her children were a "very united family" and that there was a "strong bond" between them. Regarding Dylan, Mother testified that he has "always been a really loving, warm, respectful boy" and "has always gotten really good grades." She

12

enrolled him in a gifted-and-talented program at school.  Regarding Lacy, Mother testified that dealing with her mental-health issues has been "very, very hard" on her family but that she has supported her and "took her to all of the mental health providers that [Mother] could."

Regarding her drug use, Mother testified that when she arrived at the hospital with Lacy in July 2023, she had not consumed any drugs and had passed out from a panic attack, not drug use.  Mother acknowledged that she had methamphetamine in a wallet in her purse at the hospital but testified that the purse and the methamphetamine did not belong to her.  Instead, the purse had been "gifted" to her from a friend before she left for the hospital.  Mother explained:

> Like everything happened really quickly.  It's like, for example, what if somebody gifts you a purse?  I came in [to the friend's apartment], and I needed to leave quickly, and that person is, like, 'Here. You can take this purse,' and I didn't even check to see what was in it.  And the wallet was in there because I was leaving and it was an emergency.

Mother acknowledged testing positive for methamphetamine in August 2023 but stated that she did not start using methamphetamine until after the case began.  Mother testified:

> I have lived with my children since I was 18 years old.  I've had a really difficult life.  At that time, I found myself alone, disoriented, and I had just gone through some domestic violence.  I know it's not an excuse to say, "Well, I took drugs," but it was the only thing that was keeping me alive at that time, or I was trying to kill the pain.

Mother also acknowledged that her housing situation was unstable when the case began but testified that at the time of trial, she had been living in an apartment by herself for six to eight months and was currently self-employed as a house cleaner.  She explained that if Dylan were returned to her care, Grandmother would help her take care of him.

13

Regarding her court-ordered services, Mother testified that she had completed a psychological evaluation and an OSAR. Contrary to the testimony of Paylor and Guerra, Mother testified that she also completed a psychiatric evaluation and protective-parenting classes. She confirmed that she attended but did not complete inpatient drug rehabilitation at three rehabilitation centers and attended but was not successfully discharged from individual therapy.

Mother acknowledged that she missed some of her required drug tests but could not remember all the dates that she missed. Mother testified that she attended Narcotics Anonymous online and had been sober for five or six months, although she did not have a sponsor and could not remember her date of sobriety. Mother also acknowledged that she had not taken any drug tests in the previous five to six months, which she attributed to "car troubles" and difficulty driving across town to the testing centers. Mother testified that she obtained her drugs from "people that [she] met one time." Mother denied ever using drugs in front of her children, having drugs in her home with the children present, or being under the influence of drugs while the children were with her.

Regarding Lacy's attempted suicide, Mother testified that she did not know how Lacy obtained the pills but speculated that Lacy had opened the lockbox containing the pills because she "actively wanted to commit suicide." This explanation was contrary to Mother's statement to Burks that Mother had opened the box and gave Lacy the pills. Mother also denied telling Lacy to kill herself. Regarding the allegations from 2017 that Mother's boyfriend had sexually abused Lacy, Mother testified that "[Lacy] was not abused" and stated that Lacy "told [Mother] directly" that she had not been abused.

At the conclusion of trial, the jury found by clear and convincing evidence that Mother had (1) knowingly placed or knowingly allowed Dylan to remain in conditions or

14

surroundings which endanger the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed Dylan with persons who engaged in conduct which endangers the physical or emotional well-being of the child; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Dylan. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The jury also found by clear and convincing evidence that termination of Mother's parental rights to Dylan was in the best interest of the child. *See id*. § 161.001(b)(2). The jury further found by clear and convincing evidence that Father had constructively abandoned Dylan, that he failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of Dylan, and that termination of Father's parental rights to Dylan was in the best interest of the child. *See id*. § 161.001(b)(1)(N), (O), (2). In accordance with the jury's verdict, the trial court rendered its order terminating Mother's and Father's parental rights to Dylan. This appeal by Mother followed.

## STANDARD OF REVIEW

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the children's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as

15

"essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence

16

is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

## DISCUSSION

### Best interest

In her first issue, Mother asserts that the evidence is legally and factually insufficient to support the finding that termination of her parental rights is in Dylan's best interest. We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at

17

27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

Evidence in the record both supports and is contrary to the finding that termination of Mother's parental rights is in the best interest of Dylan. The evidence in support of the finding includes evidence that Mother was arrested for an outstanding warrant and methamphetamine possession; continued to use illegal drugs while the case was ongoing; failed to complete drug rehabilitation at multiple facilities; failed to complete her court-ordered service plan, including a psychiatric evaluation, individual therapy, and protective-parenting classes; had an extensive history with the Department; failed to provide the Department with proof of stable income and housing; and had exercised poor judgment and was emotionally abusive to Lacy, Dylan's sister. Additionally, the Department presented evidence that Dylan's current placement was safe, stable, and open to adopting Dylan; that his foster parents would allow Dylan to remain in communication with his biological siblings; that Dylan was "very protective of his foster sister"; and that Dylan had improved his communication skills while in the care of his foster family. Viewing the totality of this evidence in the light most favorable to the finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of

18

Mother's parental rights was in the best interest of Dylan. Accordingly, the evidence is legally sufficient to support the best-interest finding.

The evidence contrary to the finding includes evidence that Dylan loves Mother, does not want her parental rights to be terminated, and does not want to be adopted; that Mother is employed and has lived in her current apartment for the last six to eight months; and that Mother loves Dylan. We are unable to say that this evidence is "so significant that the factfinder could not have formed a firm belief or conviction" that termination of Mother's parental rights was in the best interest of Dylan. Accordingly, we conclude that the evidence is also factually sufficient to support the finding.

We overrule Mother's first issue.

**Endangerment**

In her second issue, Mother asserts that the evidence is legally and factually insufficient to support the findings that she endangered Dylan.[5] Specifically, Mother argues that Dylan was "safe with his grandmother" at the time Lacy attempted suicide and Mother was arrested, "and no evidence was presented that [Dylan] was negatively affected by any actions of Mother, much less that he was endangered by them."

Endangerment means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99. A finding of endangerment requires more than the

_____

[5] Mother concedes that the evidence is sufficient to support the finding regarding Mother's failure to comply with her court-ordered service plan, *see* Tex. Fam. Code § 161.001(b)(1)(O), and that this finding, combined with the best-interest finding, is sufficient to support the termination of her parental rights to Dylan, *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, we are required to review an endangerment finding "[w]hen a parent has presented the issue on appeal" because of its significant collateral consequences to a parent's rights to other children. *See In re N.G.*, 577 S.W.3d 230, 235–37 (Tex. 2019); *see also* Tex. Fam. Code § 161.001(b)(1)(M).

19

threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting Tex. Fam. Code § 161.001(b)(1)(D)). Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re N.G.,* 577 S.W.3d at 234 (quoting Tex. Fam. Code § 161.001(b)(1)(E)).

We will focus our analysis on endangering conduct under subsection (E). "Conduct" includes both a parent's actions and a parent's omissions or failures to act. *A.C.*, 577 S.W.3d at 699. Thus, under subsection (E), "the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re M.L.L.*, 573 S.W.3d 353, 363 (Tex. App.—El Paso 2019, no pet.).

"Termination under this subsection must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id*. "A trial court properly may consider actions and inactions occurring both before and after a child's birth and before and after removal to establish a course of conduct." *In re A.R.D.*, 694 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2024, pet. denied).

20

Additionally, abusive conduct directed toward one child can support a finding that the parent engaged in a course of conduct that endangered another child. *See Trevino v. Texas Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no writ); *Director of the Dallas County Child Protective Serv. Unit v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ). Moreover, "subsection (E) contemplates conduct which affects the physical *or* emotional well-being of the child, and termination may be based on emotional endangerment only." *In re S.H.A.*, 728 S.W.2d 73, 83–84 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

"Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *M.L.L.*, 573 S.W.3d at 363. Thus, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The Texas Supreme Court has recently held that "[w]hile illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). "A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id*. (quoting *J.O.A.*, 283 S.W.3d at 345). "Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied).

Here, the Department presented evidence of a pattern of drug use by Mother. Methamphetamine was found in Mother's purse in July 2023, and a rational factfinder could

have disbelieved Mother's claim that the methamphetamine did not belong to her. Then, Mother tested positive for methamphetamine, amphetamines, and cocaine in August 2023. Although Mother tested negative for drugs in September 2023, she missed or refused drug tests in October 2023, November 2023, and January 2024, and she tested positive for methamphetamine and amphetamines in February 2024. Mother did not test after that, although the Department had requested that she do so on multiple occasions. "A fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs." *A.R.D.*, 694 S.W.3d at 840. Although Mother claimed to have been sober for five to six months prior to trial, a rational factfinder could have disbelieved this testimony, particularly considering Mother's failure to test after February 2024 and her failure to complete rehabilitation in April, May, and July 2024.

In addition to the evidence of Mother's continued drug use while the case was ongoing, the Department presented evidence that Mother: (1) denied that Lacy had been sexually abused by Mother's boyfriend; (2) told Lacy to kill herself; (3) gave Lacy access to medication that Lacy used to attempt suicide; (4) failed to complete her court-ordered service plan, including a psychiatric evaluation that was considered necessary to treat Mother's mental-health issues; and (5) told Lacy and Dylan that Lacy was at fault for the case, which caused Dylan and Lacy to experience "suicidal ideations."

Viewing the totality of this evidence in the light most favorable to the finding, we conclude that a reasonable factfinder could form a firm belief or conviction that Mother engaged in a course of conduct that endangered Dylan's physical and emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). Accordingly, the evidence is legally sufficient to support the finding. We also cannot say that the evidence contrary to the finding, which consisted primarily

22

of Mother's denials about the conduct that the Department alleged she committed, is "so significant that the factfinder could not have formed a firm belief or conviction" that she endangered Dylan's well-being. Accordingly, the evidence is also factually sufficient to support the finding.

We overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's order of termination.

_____

Gisela D. Triana, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed: January 9, 2025